# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 23, 2020       Decided March 19, 2021

No. 20-5074

GERALD H. HAWKINS, INDIVIDUALLY AND AS A TRUSTEE OF
THE CN HAWKINS TRUST AND GERALD H. HAWKINS AND
CAROL H. HAWKINS TRUST, ET AL.,
APPELLANTS

v.

DEBRA A. HAALAND, SECRETARY OF THE INTERIOR,
ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-01498)

———

*David J. Deerson* argued the cause for appellants. With him on the briefs were *Damien M. Schiff* and *Dominic M. Carollo*.

*John L. Smeltzer*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Jeffrey Bossert Clark*, Assistant Attorney General, *Eric Grant*, Deputy Assistant Attorney General, and *Erika Kranz* and *Daron T. Carreiro,* Attorneys.

Before: ROGERS, KATSAS and RAO, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Ranchers in the Upper Klamath Basin region of the State of Oregon who hold irrigation water rights, sued to prevent the exercise of water rights that interfere with the irrigation of their lands. The district court dismissed their lawsuit for lack of standing under Article III of the Constitution. Viewing their standing to turn on whether the Klamath Tribes can call upon state officials to implement their superior instream water rights without the consent of the federal government, the ranchers challenge a Protocol Agreement executed by the United States and the Tribes. They contend that the federal government, as trustee of those water rights, unlawfully delegated its call-making authority to the Tribes and that absent such delegation, the Tribes would be unable to secure state implementation of their water rights. The ranchers maintain that the economic, environmental, and recreational injuries they suffered because of water cut offs imposed to satisfy the Tribes' superior water rights are fairly traceable to the federal government's delegation of its authority and could be redressed by invalidation of the Protocol, which would restore the federal government's call-making authority. We conclude that the Protocol does not delegate federal authority to the Tribes but recognizes the Tribes' preexisting authority to control their water rights under a Treaty in 1864 with the United States. Accordingly, the ranchers have not established the causation or redressability necessary for standing, and the dismissal of their complaint is affirmed.

## I.

The Klamath Tribes have hunted, fished, and lived in the Klamath River watershed of Southern Oregon for over a

thousand years. *See Oregon Dep't of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 766 (1985); *United States v. Adair*, 723 F.2d 1394, 1397–98 (9th Cir. 1983). In 1864, the Tribes entered into a treaty with the United States in which they ceded most of their aboriginal territory, approximately 22 million acres, excluding approximately 1.9 million acres that the parties agreed would be held for the Tribes "as an Indian reservation." *Oregon Dep't*, 473 U.S. at 755 (internal quotation marks omitted) (quoting Treaty Between the United States of America and the Klamath and Moadoc Tribes and Yahooskin Band of Snake Indians ("1864 Treaty") art. I, Oct. 14, 1864, 16 Stat. 707, 707–08).[1] The Tribes reserved "the exclusive right of taking fish in the streams and lakes" on the reservation, 1864 Treaty art. I, 16 Stat. at 708, and of "gathering edible roots, seeds, and berries within its limits," *id.*, and the United States agreed to compensate the Tribes for the ceded lands in the form of federal expenditures to promote the Tribes' well-being and "advance them in civilization . . . especially agriculture," *id.* art. II, 16 Stat. at 708.

After establishing the Klamath Reservation, Congress enacted the General Allotment Act of 1887, which authorized subdivision of the reservation and allotment of parcels granted in fee to individual members of the Tribes, as part of a policy, since repudiated, "to extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into the society at large." *Upper Skagit Indian Tribe v. Lundgren*, 138 S. Ct. 1649, 1652–53 (2018) (internal quotation marks omitted) (quoting *Cnty. of Yakima v. Confederated*

---

[1] The Klamath Tribes are federally recognized as a single tribal entity, but that entity is composed of three historically distinct groups: the Klamath tribe, the Modoc tribe, and the Yahooskin band of Snake Indians. *See* 1864 Treaty preamble, 16 Stat. at 707. The court follows the practice of the parties to refer to "the Tribes" while some older sources refer to the Klamath as a single "tribe."

*Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251, 254 (1992)). Since then Congress has addressed the federal government's relationship to the Tribes in ways directly relevant here. Nearly a century later, Congress ended the federal government's historical role as trustee while reaffirming the Tribes' reserved aboriginal water rights. By 1986, Congress had restored certain of its trustee services to the Tribes, but again expressly left the Tribes' aboriginal water rights in the Tribes' exclusive control.[2]

The Klamath Termination Act of 1954 terminated federal supervision of the Tribes and provided for disposition of their reservation land that had not been allotted. Pub. L. No. 83-587, § 1, 68 Stat. 718, 718. It closed the tribal roll and provided that tribal members could elect to withdraw from the Tribes and receive a cash payout of the individual's interest in tribal property. Termination Act §§ 3–5, 68 Stat. at 718–19. The Tribes' property could be appraised and sold to fund individual cash payments. *Id.* § 5, 68 Stat. at 719. The property of the remaining members of the Tribes would be managed by a private trustee or corporation. *Id.* All restrictions on sale or encumbrance of land owned by members of the Tribes would be removed four years after the Act became effective. *Id.* § 8, 68 Stat. at 720. Specifically, the Termination Act provided:

> Upon removal of Federal restrictions on the property of the tribe and individual members thereof, the

---

[2] Regarding the federal government's trust relationship with Indian tribes, *see* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW §§ 5.05(1)(b)–(2), 15.03, 19.06 (Nell Jessup Newton ed., 2017) (hereinafter "COHEN'S HANDBOOK"); *see also* Reid Peyton Chambers, *Judicial Enforcement of the Federal Trust Responsibility to Indians*, 27 STAN. L. REV. 1213 (1975); Mary Christina Wood, *Indian Land and the Promise of Native Sovereignty: The Trust Doctrine Revisited*, 1994 UTAH L. REV. 1471.

Secretary [of the Interior] shall publish in the Federal Register a proclamation declaring that the Federal trust relationship to the affairs of the tribe and its members has terminated. Thereafter individual members of the tribe shall not be entitled to any of the services performed by the United States for Indians because of their status as Indians and, except as otherwise provided in this Act, all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe, and the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction.

*Id.* § 18(a), 68 Stat. at 722. Regarding water and fishing rights, the Termination Act provided:

(a) Nothing in this Act shall abrogate any water rights of the tribe and its members, and the laws of the State of Oregon with respect to the abandonment of water rights by nonuse shall not apply to the tribe and its members until fifteen years after the [termination of the federal trust relationship to the tribe].

(b) Nothing in this Act shall abrogate any fishing rights or privileges of the tribe or the members thereof enjoyed under Federal treaty.

*Id.* § 14, 68 Stat. at 722.

About 78% of the Tribes' members elected to withdraw and receive a payout. *Klamath & Modoc Tribes v. United States*, 436 F.2d 1008, 1012 (Ct. Cl. 1971). Reservation property not set aside to pay their claims was transferred to a

private trustee. *Id.* In 1961, the Secretary of the Interior published a notice in the Federal Register that "the Federal trust relationship to the affairs of the tribe and its members is terminated." Termination of the Federal Trust Relationship to the Property of the Klamath Tribe of Indians Located in the State of Oregon, and of Federal Supervision Over the Affairs of the Individual Members Thereof, 26 Fed. Reg. 7362, 7362 (Aug. 12, 1961).

In 1986, Congress unwound some of the effects of the Termination Act. The Klamath Indian Tribe Restoration Act of 1986 restored the Federal trust relationship with the Tribes. It provided:

> All rights and privileges of the tribe and the members of the tribe under any Federal treaty, Executive order, agreement, or statute, or any other Federal authority, which may have been diminished or lost under the [1954 Termination Act] are restored, and the provisions of such Act, to the extent that they are inconsistent with this Act, shall be inapplicable to the tribe and to members of the tribe after the date of the enactment of this Act.

Pub. L. No. 99-398, § 2(b), 100 Stat. 849, 849. The Tribes were restored to the status of a federally recognized tribe. *Id.* § 2(a), 100 Stat. at 849. The Act specified that it did not "alter any property right or obligation," and thus did not restore previously alienated lands to the Tribes' land base. *See id.* §§ 2(d), 6, 100 Stat. at 850. It also expressly provided that the Act would not "affect in any manner any hunting, fishing, trapping, gathering, or water right of the tribe and its members." *Id.* § 5, 100 Stat. at 850. The United States presently recognizes the Tribes as a tribal sovereign, 25 U.S.C. §§ 3601(3), 5123(h), with inherent powers of self-government,

including powers over land and water rights except as reserved by Congress. *See Kahawaiolaa v. Norton*, 386 F.3d 1271, 1273 (9th Cir. 2004); *Burlington N. R.R. Co. v. Blackfeet Tribe of the Blackfeet Indian Rsrv.*, 924 F.2d 899, 902 (9th Cir. 1991), *overruled on other grounds by Big Horn Cnty. Elec. Co-op., Inc. v. Adams*, 219 F.3d 944, 953 (9th Cir. 2000); *see also Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014); *Oregon Dep't*, 473 U.S. at 765–66; *United States v. Shoshone Tribe of Indians of Wind River Rsrv.*, 304 U.S. 111, 116–17 (1938); Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 84 Fed. Reg. 1200, 1202 (Feb. 1, 2019).

**A.**

Prior to passage of the Restoration Act, the determination of competing claims to water in the Klamath Basin was underway in the federal courts and under Oregon law. The Tribes' reserved water rights arise as an exception to the doctrine of prior appropriation governing rights to use water from river systems in Oregon and other western states, based on acknowledgement that the establishment of an Indian reservation and other federal reservations impliedly reserves then-unappropriated water "to the extent needed to accomplish the purpose of the reservation." *Cappaert v. United States*, 426 U.S. 128, 138 (1976).

In 1975, the United States sued in federal court for a declaration of water rights in the Williamson River drainage in the Klamath Basin. *Adair*, 723 F.2d at 1398. The Tribes intervened as a plaintiff. *Id.* at 1399. The State of Oregon intervened as defendant and moved unsuccessfully for the federal court to abstain to state proceedings. *Id.* The Court of Appeals for the Ninth Circuit concluded that the Tribes held a right to "a quantity of the water flowing through the reservation

. . . for the purpose of maintaining the [Tribes'] treaty right to hunt and fish on reservation lands." *Id.* at 1410. The right is "non-consumptive" in that the holder is not entitled to withdraw water from the stream but has "the right to prevent other appropriators from depleting the stream['s] waters below a protected level in any area where the non-consumptive right applies." *Id.* at 1411. Further, the right carried a priority date of "time immemorial," and the amount of water protected under the right was not to the flows present at the 1864 Klamath Treaty, but rather to "the amount of water necessary to support its hunting and fishing rights as currently exercised to maintain the livelihood of Tribe members." *Id.* at 1414–15. Additionally, the court concluded that:

> [T]he [federal] [g]overnment has no ownership interest in, or right to control the use of, the Klamath Tribe's hunting and fishing water rights. The hunting and fishing rights from which these water rights arise by necessary implication were reserved by the Tribe in the 1864 treaty with the United States. The hunting and fishing rights themselves belong to the Tribe and may not be transferred to a third party. Because the Klamath Tribe's treaty right to hunt and fish is not transferable, it follows that no subsequent transferee may acquire that right of use or the reserved water necessary to fulfill that use.

*Id.* at 1418 (citations omitted). The court proceeded to determine the extent of the federal government's own water right, *id.* at 1418–19, while leaving the quantification of the Tribes' water right to be determined in the state proceeding, *id.* at 1399, 1407. In 1952, Congress had adopted the McCarran Amendment, 43 U.S.C. § 666(a), which waived the United States' sovereign immunity and granted consent to join the

United States in any suit for the adjudication of rights to use of a river system or other source.

Under Oregon law, a call system is used to allocate water. The process, as relevant, begins when the Oregon Water Resources Department ("OWRD") collects the water claims submitted by various persons, resolves objections to them, and as needed holds a hearing on the claims. Or. Rev. Stat. §§ 539.021, .030, .100, .110. OWRD will issue "findings of fact and an order of determination . . . establishing the several rights to the waters of the stream." *Id.* § 539.130(1). Upon issuance of the order, OWRD's administrative determination is in "full force and effect." *Id.* § 539.130(4). OWRD files its findings and order, along with the administrative record, in Oregon Circuit Court for a non-jury adjudication, where exceptions can be filed. *Id.* § 539.130(1), .150. While the matter is pending before the Circuit Court, the division of water from the stream involved in the appeal is made in accordance with the order of OWRD. *Id.* § 539.170. Upon the "final determination" of water rights, OWRD will issue "a certificate setting forth the name and post-office address of the owner of the right; the priority of the date, extent and purpose of the right, and if the water is for irrigation purposes, a description of the legal subdivisions of land to which the water is appurtenant." *Id.* § 539.140. To administer determined water rights, OWRD has established water districts, *id.* § 540.010, whose "watermasters" allocate water in accordance with the users' existing water rights of record in the OWRD, *id.* §§ 540.020, .045(1)(a), with authority — when a holder of water rights has placed a "call" for water — to suspend conflicting upstream usages, *see* Or. Admin. R. 690-025-0025.

In 1975, the Klamath Basin Adjudication began when OWRD announced the intent to investigate usage of the Klamath River. The Tribes and the federal government filed

the water enforcement claims at issue in 1997. The federal government's claims (Nos. 625–40) included claims on behalf of the Tribes, whose trust relationship had by then been restored; the Tribes filed their own claim (No. 612), which incorporated the claims made by the federal government. Following a lengthy administrative process, an administrative law judge in 2011 issued a proposed order approving the claims of the federal government and the Tribes and quantifying the flows "necessary to establish a healthy and productive habitat to allow the exercise of the Klamath Tribes' hunting, fishing, trapping, and gathering rights guaranteed by the treaty of 1864."[3] OWRD's Administrative Determination largely confirmed the ALJ's proposal as to the federal government's claims, but dismissed the Tribes' omnibus claim (No. 612) as "duplicative of the United States' claims, not additive," because "[t]he United States holds the rights recognized herein in trust for the Klamath Tribes." Administrative Determination, *supra* note 3, at 4898, 5074 (citing *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 810 (1976)). It also provisionally confirmed water rights claimed by the ranchers with priority dates of 1864 or later, including irrigation water rights acquired from reservation allottees. *See* Am. Compl. ¶¶ 5, 8. OWRD filed its Administrative Determination in the Oregon Circuit Court, Or. Rev. Stat. § 539.130(1), and the parties here, and other claimants, filed exceptions, *id.* § 539.150. The Oregon Circuit Court recently issued an opinion on Phase 3, Part 1, Group C Motions, *In re Waters of the Klamath River Basin*, No.

---

[3] Amended Corrected Findings of Fact and Order of Determination at 5153, *Klamath River Basin General Stream Adjudication* (Feb. 28, 2014), https://www.oregon.gov/owrd/programs/WaterRights/Adjudications/KlamathRiverBasinAdj/Pages/ACFFOD.aspx (hereinafter "Administrative Determination").

WA1300001 (Or. Cir. Ct. Feb. 24, 2021) ("Or. Cir. Ct. Op., Feb. 24, 2021").

The Tribes and the federal government executed a Protocol Agreement following OWRD's Administrative Determination in order "to position themselves to make [water rights] calls in a timely and effective manner." Protocol at 1 (May 2013). It provided that "[e]ach Party retains its independent right to make a call" and that if after following a consultation procedure "the Parties cannot agree on whether to make a call, either Party may independently make a call and the other will not object to the call." *Id.* at 3. As amended in 2019, the Protocol extends some consultation deadlines and adds that "the United States retains the right not to concur with any call for water that is inconsistent with the [Administrative Determination] or other legal obligations." Protocol at 4 (Mar. 2019).

In June 2013, the Tribes issued enforcement calls to OWRD. Am. Compl. ¶ 25. Oregon, the Tribes, and landowners including most of the ranchers here then entered into the Upper Klamath Basin Comprehensive Agreement (the "Upper Basin Agreement"). *Id.* ¶ 26. The Tribes agreed to forbear from enforcing the full extent of their reserved instream water rights in exchange for commitments by the other parties as to water use, riparian protection, and economic development. Notice Regarding Upper Klamath Basin Comprehensive Agreement, 82 Fed. Reg. 61,582, 61,582–83 (Dec. 28, 2017) ("Notice"). During 2014–16, the Tribes made calls for flows at these lower levels. Am. Compl. ¶ 29. But, in 2017, citing a lack of progress in implementing the promised benefits, the Tribes reverted to the higher water levels under OWRD's Administrative Determination. *Id.* ¶ 30. The federal government terminated the Upper Basin Agreement in view of Congress's failure to approve the necessary funding. Notice,

82 Fed. Reg. at 61,583–84. In 2018 and 2019, the Tribes again issued calls for the full enforcement of their water rights. Am. Compl. ¶¶ 31–32.

**B.**

The ranchers filed the instant lawsuit against the federal government in May 2019. In their amended complaint, they alleged that after termination of the Upper Basin Agreement, the Tribes "by and through the power and authority delegated by" the federal government issued calls for enforcement of the full extent of their instream flow water rights. Am. Compl. ¶¶ 31–32. OWRD's enforcement of these calls, they alleged, resulted in "widespread and severe curtailment" of water rights for irrigation use on their lands, resulting in environmental and economic injury, and that similar injury will result from future calls. *Id*. ¶¶ 31–38. Specifically, the ranchers alleged they have suffered and will continue to suffer the following injuries: (1) reduction of wildlife on their ranches, (2) infestation of undesirable plants, (3) the loss of plant communities, (4) lost revenues, and (5) reduced property values. *Id*. ¶¶ 36–37. The ranchers argued that the Protocol constitutes an unlawful delegation to the Tribes of the federal government's authority to decide whether to concur in a call. *Id.* ¶¶ 41–46. Further, they argued that the calls made in 2013 and 2017–19 constituted major federal actions for which an environmental impact statement should have been prepared under the National Environmental Policy Act ("NEPA"). *Id*. ¶¶ 47–53. As a remedy, they asked the district court to set aside the Protocol, all previous calls, and to enjoin any future calls by the federal government until it "fully complied with the law," including "to make a final, independent decision on the propriety of a call, having taken into account the general public interest and welfare, as well as NEPA." *Id*.

The district court dismissed the complaint for lack of Article III standing. The court determined that the Klamath Tribes "are entitled to enforce their senior water rights . . . regardless of whether the Protocol . . . stand[s]." Mem. Op. 18 (Jan. 31, 2020). The ranchers thus could not demonstrate that their injuries were traceable to the challenged Protocol or to any action of the federal government. *Id.* at 10–15. Nor could they show redressability because even if the federal government were prohibited from enforcing the Tribes' rights, the district court concluded, the Tribes would do so themselves, resulting in the same hardships to the ranchers. *Id.* at 15–21. The ranchers appeal.

## II.

To establish standing to litigate in the federal courts, Article III of the Constitution requires a plaintiff to "present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019) (internal quotation marks omitted) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008)). Causation requires a "fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). And redressability requires a litigant to demonstrate "a likelihood that the requested relief will redress the alleged injury." *Id.*

The ranchers frame their claims in terms of procedural injury. They concede that as junior appropriators they have no right to water that infringes the Tribes' instream rights, Appellants' Br. 5–7, and priority enforcement of water rights through a call system is in accordance with the nature of those rights under Oregon law, *see Montana v. Wyoming*, 563 U.S.

368, 375–76 (2011); *Klamath Irrigation Dist. v. United States*, 227 P.3d 1145, 1150 (Or. 2010).

To establish traceability in a procedural-injury case, "an adequate causal chain must contain at least two links:" (1) a connection between the omitted procedure and a government decision and (2) a connection between the government decision and the plaintiff's particularized injury. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306 (D.C. Cir. 2013) (internal quotation marks omitted) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 668 (D.C. Cir. 1996)). The plaintiff is not required to "show that but for the alleged procedural deficiency the agency would have reached a different substantive result. 'All that is necessary is to show that the procedural step was connected to the substantive result.'" *Id.* (citations omitted) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)). Claims for procedural violations also receive a "relaxed redressability requirement" in which the plaintiff need only show that "correcting the alleged procedural violation *could* still change the substantive outcome in the [plaintiff's] favor" not "that it *would* effect such a change." *Narragansett Indian Tribal Historic Pres. Office v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020). These relaxed standards do not apply to the link between the government decision and the plaintiff's injury. *See WildEarth Guardians*, 738 F.3d at 306. "[Alt]hough the plaintiff in a procedural-injury case is relieved of having to show that proper procedures would have caused the agency to take a different substantive action, the plaintiff must still show that the agency action was the cause of some redressable injury to the plaintiff." *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015) (internal quotation marks omitted) (quoting *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1279 (D.C. Cir. 2007)).

15

Notably here, "[w]here traceability and redressability depend on the conduct of a third party not before the court 'standing is not precluded, but it is ordinarily substantially more difficult to establish.'" *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 381 (D.C. Cir. 2020) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)). "The party invoking our jurisdiction must show that the third party will act 'in such manner as to produce causation and permit redressability of injury.'" *Id.* A permissible theory of standing "does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Dep't of Commerce*, 139 S. Ct. at 2566.

The ranchers trace their alleged injuries to OWRD orders that compelled them to curtail irrigation of their lands. Am. Compl. ¶¶ 25, 30–32. Those orders follow from the Tribes' calls for enforcement of their reserved water rights. *Id.* ¶¶ 22–25, 29–33. The Tribes and OWRD are third parties not joined as defendants in the ranchers' lawsuit here. Instead, the ranchers sued only the federal government on the premise that the Tribes would be unable to obtain enforcement of their calls for water in the absence of concurrence by the federal government. Am. Compl. ¶¶ 2, 38. To determine whether the ranchers have standing, the court must determine whether the federal government's concurrence in or non-objection to the Tribes' enforcement calls will have a predictable effect on the OWRD watermaster's issuance of orders that require the ranchers to curtail irrigation of their lands. For the following reasons, we conclude that no such concurrence requirement exists under federal or Oregon law, and that, consequently, the ranchers cannot establish the causation or redressability necessary for standing.

16

**A.**

The Tribes' water rights have their source in federal law. The 1864 Klamath Treaty extinguished the Tribes' title to ceded lands while preserving their "exclusive right" to hunt and fish on reservation land. Art. I, 16 Stat. at 707–08. The scope of the Tribes' water rights under the Treaty is a question of federal law. Under the "reserved water rights" doctrine, when the federal government creates an Indian reservation, it impliedly reserves "that amount of water necessary to fulfill the purpose of the reservation." *Cappaert*, 426 U.S. at 141. The 1864 Treaty thus reserved to the Tribes "a quantity of the water flowing through the reservation . . . for the purpose of maintaining [their] treaty right to hunt and fish on reservation lands." *Adair*, 723 F.2d at 1410. The nature of the federal government's trust relationship with the Tribes is also governed by federal law, and the ranchers' understanding of the federal government's role and the Protocol is "fundamentally in error." Appellees' Br. 24.

The principles announced by the Supreme Court disfavor the ranchers' assertion of standing. In *United States v. Mitchell* ("*Mitchell I*"), 445 U.S. 535 (1980), individual Indians who had been allotted former reservation land sought damages from the federal government for failing its fiduciary duties to maximize the value of timber on the allotted land. *Id.* at 537. The Supreme Court concluded that under the General Allotment Act "the trust Congress placed on allotted lands is of limited scope," and held, therefore, that the Act did not give rise to a claim for breach of fiduciary duty of timber management. *Id.* at 542–43, 546. On remand, the U.S. Court of Claims interpreted various statutes and regulations related to timber management to impose fiduciary duties on the federal government as trustee. The Supreme Court affirmed, holding in *United States v. Mitchell* ("*Mitchell II*"), 463 U.S. 206

(1983), that the cited statutes and regulations vested in the federal government "full responsibility to manage Indian resources and land for the benefit of the Indians" and thereby "establish[ed] a fiduciary relationship and define[d] the contours of the United States' fiduciary responsibilities." *Id.* at 224. Although this conclusion was "reinforced by the undisputed existence of a general trust relationship between the United States and the Indian people," the Court principally grounded its holding on the text of the statues and regulations, which "clearly establish[ed] fiduciary obligations of the [federal government] in the management" of the lands and resources at issue. *Id.* at 224–26; *see also* COHEN'S HANDBOOK § 5.05(1)(b).

This court applied these principles in *Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476 (D.C. Cir. 1995). There, as here, a state had commenced a general stream adjudication and joined the United States. *Id.* at 1478. The Shoshone-Bannock Tribes argued that they were entitled to water rights beyond their reservation's boundaries based on a treaty provision granting them the right to hunt on unoccupied land outside the reservation. *Id.* When the federal government declined to assert the off-reservation claims on their behalf, the tribes filed suit seeking to compel the U.S. Attorney General to file their claims. *Id.* at 1479. This court acknowledged that under the federal doctrine reserved water rights on Indian reservations "belong to the Indians rather than to the United States, which holds them only as trustee." *Id.* Recognizing that the Attorney General generally retained discretion to conduct litigation on behalf of the United States, the court noted that the tribes had identified no statute or other restriction limiting that discretion. *Id.* at 1480–82. Explaining, the court stated:

> While it is true that the United States acts in a fiduciary capacity in its dealings with Indian tribal

property, it is also true that the government's fiduciary responsibilities necessarily depend on the substantive laws creating those obligations. We agree with the district court that an Indian tribe cannot force the government to take a specific action unless a treaty, statute or agreement imposes, expressly or by implication, that duty.

*Id.* at 1482 (citations omitted). The "'mere existence' of the Treaty [did not] require[] the federal government to protect whatever [water claims] the Tribes may wish to advance." *Id.*

Neither the 1864 Klamath Treaty, nor the 1954 Termination Act, nor the 1986 Restoration Act establish a trust relationship between the federal government and the Tribes that requires the federal government to concur in the Tribes' calls for enforcement of their reserved instream water rights. Article I of the Treaty guaranteed the Tribes' "exclusive" hunting and fishing rights on the reservation. That exclusive right was expressly acknowledged by Congress as to the reserved water rights in both the Termination Act and the Restoration Act. Those Acts provided as well that nothing in their provisions would "affect in any manner any . . . water right of the tribe and its members," Restoration Act § 5, 100 Stat. at 850, or "abrogate any water rights of the tribe and its members," Termination Act § 14(a), 68 Stat. at 722. Despite restoring federal recognition to the Tribes and the "rights and privileges" that might have been diminished under the Termination Act, section 5 of the Restoration Act expressly carved out the Tribes' exclusive rights guaranteed by the Treaty. The federal government's historical trustee relationship with Indian tribes was thereby limited so as not to interfere with the Tribes' exclusive rights under Article I of the 1864 Treaty.

In short, as was true before the Restoration Act, the federal government has "no ownership interest in, or right to control the use of, the Klamath Tribe's hunting and fishing" rights and attendant reserved water rights. *Adair*, 723 F.2d at 1418; *see Oregon Dep't*, 473 U.S. at 765–68. Neither statutory text nor the historical trusteeship that existed prior to the Termination Act indicate that Congress intended in the Restoration Act to require the federal government's concurrence for the Tribes' instream calls to be effective. They do not require the federal government to assume "elaborate control," *Mitchell II*, 463 U.S. at 224–25, over the Tribes' water rights. Nor would such a requirement be a "right," "privilege," "service," or "benefit" within the meaning of section 2 of the Restoration Act, 100 Stat. at 849. To the contrary, such a concurrence requirement would directly interfere with the Tribes' exercise of their sovereignty, here their assertion and control of their reserved water rights. *See* Restoration Act § 5, 100 Stat. at 850. *See generally* COHEN'S HANDBOOK § 19.06. Indeed the federal government maintains that it was obligated, if asked, to concur in lawful water calls proposed by the Tribes. This court previously held that despite the existence of a trust relationship "an Indian tribe cannot force the government to take a specific action unless a treaty, statute, or agreement imposes, expressly or by implication, that duty." *Shoshone-Bannock Tribes*, 56 F.3d at 1482. The court need not consider whether that standard was met here given our conclusion that the Tribes were free to make calls in the exercise of their treaty rights.

## B.

The heart of the ranchers' argument is that a concurrence requirement is found in Oregon law, which is made applicable to the Klamath Basin Adjudication by the McCarran

Amendment of 1952, 43 U.S.C. § 666(a).[4] Appellants' Br. 13–24. In *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), the Supreme Court held that the McCarran Amendment is properly understood to reach Indian reserved water rights held in trust on behalf of Indians. *Id.* at 809. The Supreme Court emphasized that in "resolv[ing] conflicting claims to a scarce resource," *id.* at 812, such state jurisdiction "in no way abridges any substantive claim on behalf of Indians under the doctrine of reserved rights," *id.* at 813. The McCarran Amendment, then, does not change the fact that the substance and scope of tribal water rights is governed by federal law. *Arizona v. San Carlos Apache Tribe of Ariz.*, 463 U.S. 545, 571 (1983). Necessarily, "[s]tate courts, as much as federal courts, have a solemn obligation to follow federal law." *Id.* Still, in submitting federal water right

---

[4] The McCarran Amendment provides:

> Consent is given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit. The United States, when a party to any such suit, shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty, and (2) shall be subject to the judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances: *Provided*, That no judgment for costs shall be entered against the United States in any such suit.

43 U.S.C. § 666(a).

controversies to state courts for "adjudication" or "administration," the Supreme Court concluded that state procedural rules apply because the McCarran Amendment "bespeaks a policy that recognizes the availability of comprehensive state systems for adjudication of water rights," which advance the goal of avoiding piecemeal proceedings and inconsistent dispositions. *Colorado River*, 424 U.S. at 819; *see United States v. Idaho ex rel. Idaho Dep't of Water Res.*, 508 U.S. 1, 6–8 (1993).

The ranchers maintain that requiring the concurrence of the legal title holder (i.e., the trustee) is a state procedural rule to which the McCarran Amendment subjects the Tribes' reserved water rights. The federal government suggests that even if there were such a rule, it would be a substantive one that flows from the nature of the trust relationship, not state procedure. Appellees' Br. 32–33. We need not resolve that question because none of the four sources of an Oregon-law concurrence requirement offered by the ranchers show that Oregon law requires the federal government to concur in the Tribes' calls for their reserved water rights held in trust.

(1) *Fort Vannoy Irrigation District v. Water Resources Commission*, 188 P.3d 277 (Or. 2008). The ranchers characterize *Fort Vannoy* as establishing a general rule that "a call for the implementation of water rights that are held in trust must be approved by the holder of legal title." Appellants' Br. 16. No such broad proposition is found in *Fort Vannoy*. There, Ken-Wal Farms had filed an application to change the points of diversion for water under two water rights certificates, which had been issued to the Fort Vannoy Irrigation District. *Fort Vannoy*, 188 P.3d at 280–81. By Oregon statute, the "holder of any water use subject to transfer" is given the authority to seek a change of the point of diversion. *Id.* at 281 (quoting Or. Rev. Stat. § 540.510(1)). An irrigation district to facilitate the

construction of irrigation works is formed upon proposal of landowners, governed by an elected board of directors, and has the power to acquire lands for reservoirs or other purposes. *Id.* at 286. The "legal title to all such property 'vests in the irrigation district and is held by it in trust.'" *Id.* (alterations omitted) (quoting Or. Rev. Stat. § 545.253). The narrow question in *Fort Vannoy* was whether such a district is the "holder of any water use subject to transfer," when it receives the certificate to a particular water right. *Id.* at 286, 288.

In identifying the "holder," the court in *Fort Vannoy* examined the trust relationship between the irrigation district and its members. *Id.* at 295. The trust relationship was not governed by federal Indian law; instead, a state statute established that property acquired by the district would be held in trust and the board was empowered "to hold, use, acquire, manage, occupy, possess and dispose of the property as provided in the Irrigation District Law." *Id.* (quoting Or. Rev. Stat. § 545.253). Relying in part on the Oregon law of private trusts, the court in *Fort Vannoy* concluded that "the phrase 'holder of any water use subject to transfer' cannot be construed as referring to Ken–Wal, because such a construction would run afoul of the trust relationship by permitting a beneficiary to manage the trust property." *Id.* at 295–96.

As is evident, *Fort Vannoy* did not establish a general procedural rule governing calls to enforce water rights held in trust and its construction of the state statutes governing irrigation districts has nothing to say about a trust relationship created by federal Indian law.

(2) State statutes related to water rights certificates. The ranchers urge that the necessity of a concurrence by the legal title holder is reflected in Oregon's procedures for stream adjudication. Appellants' Br. 17. At the conclusion of a stream

adjudication, they state, OWRD issues a certification listing the owner of the right, which original certificate is sent to the owner and used by the watermasters to determine whether action should be taken. *See* Or. Rev. Stat. § 539.140. The owner of an equitable interest, they continue, does not receive a certificate. Appellants' Br. 17–18. The ranchers maintain that the reasonable inference from this administrative process is that implementation of water rights is "keyed" to the certification, and implementation of the Tribes' equitable water right depends at least in part on the federal government's say. *Id.* at 18. Even were the court to assume for purposes of argument that the ranchers have accurately described the process, they do not demonstrate that OWRD regulations authorizing enforcement of the Administrative Determination require such a certificate. The OWRD watermasters are to allocate water in accordance with the claims determined in the Determination. *See* Or. Admin. R. 690-025-0020(1)–(2), -0025(1). Those claims list rights in the name of both the Tribes and the federal government. *See, e.g.*, Administrative Determination at 5076 (listing the Tribes as the "claimants" and the federal government as "trustee" for the Tribes). Nothing in the ranchers' cited authority on certificates imposes a concurrence requirement here.

(3) Denial of the Tribes' independent claim in OWRD's Administrative Determination. As noted, OWRD reasoned that the Tribes' composite claim (No. 612) was "duplicative of the [federal government's] claims, not additive. The [federal government] holds the rights recognized herein in trust for the Klamath Tribes. *Colorado River Water Conservation Dist. v. United States*, 424 [U.S.] 800, 810 (1976)." Administrative Determination at 4898, 5074. The citation to *Colorado River* reveals this ruling was grounded in OWRD's understanding of federal law. Right or wrong, OWRD's decision to deny the

Tribes' claim cannot reasonably be understood to impose a *state law* concurrence requirement.

The ranchers' view is that recognizing the Tribes' authority to exercise their own water rights is inconsistent with OWRD's determination that the federal government "holds" the water rights "in trust" for the Tribes. *See* Appellants' Br. 21–23. The ranchers also point to the recent decision of the Oregon Circuit Court indicating that the Tribes' water rights are held by the United States "in trust," and declining to disturb the Administrative Determination on this point. Or. Cir. Ct. Op., Feb. 24, 2021, at 8–9; Appellants' FED. R. APP. P. 28(j) Ltr. of Mar. 3, 2021. This misunderstands the nature of the limited trust involved. Although Congress may abrogate or diminish treaty rights by clearly expressed intent, *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999), the Termination Act abrogated the Tribes' land rights but it did not abrogate any reserved water rights of the Tribes. The Restoration Act restored the federal trust relationship with the Tribes while expressly stating in section 5 that it would not "affect in any manner any . . . water right of the [Tribes]." 100 Stat. at 850. Unlike in *Mitchell II*, where federal statutes and regulations "establish[ed] 'comprehensive' responsibilities" in the federal government for managing the harvesting of Indian timber, 463 U.S. at 222 (quoting *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145 (1980)), the relevant federal statutes have preserved the Tribes' instream water rights impliedly reserved in the 1864 Treaty for tribal fisheries and fishing rights. Absent a treaty or statutory provisions clearly abrogating or diminishing the Tribes' exclusive instream rights, their beneficial ownership of reservation lands includes "all rights normally associated with 'fee simple absolute title.'" *Blackfeet Tribe*, 924 F.2d at 902 (quoting *Shoshone Tribe of Wind River*, 304 U.S. at 117). In denying the Tribes' independent claim, OWRD relied on the principle of federal

law that water rights reserved for Indians are held in trust by the federal government, whose limited trust designation does not imply federal authority or obligations to control or manage the trust resource. Given the specific text of the Termination Act and the Restoration Act, the Tribes retain full authority to control the use of their water right. *See Oregon Dep't.*, 473 U.S. at 765–67; *Adair*, 723 F.2d at 1418; *Blackfeet Tribe*, 924 F.2d at 902. Nothing in the recent opinion of the Oregon Circuit Court could alter the federal law that defines and determines the scope of the Tribes' reserved water rights. The ranchers do not contest the well-established legal federal precedent that the substance of the Tribes' reserved water rights remains governed by federal law even in state water adjudicatory proceedings. *See* Appellants' Br. 13.

(4) Emails from OWRD employees suggesting the federal government's concurrence was necessary. The ranchers' reliance on informal communications between OWRD employees is unavailing. In 2017, upon receiving a call from the Tribes, an OWRD employee emailed another employee, "[W]e need to await concurrence from [the Bureau of Indian Affairs] on this." In 2018, an OWRD employee inquired about whether the federal government would again provide an "official concurrence." Even assuming the emails indicate these employees thought the federal government's concurrence was needed for an effective Tribal call, in the absence of a legal basis for a concurrence requirement these emails are insufficient to show that OWRD would predictably decline to enforce the Tribes' instream rights without a concurrence by the federal government. Insofar as the emails reflect a misunderstanding of the federal trust relationship, that would presumably be corrected by today's decision, which explains that there is no federal law concurrence requirement for the Tribes' water rights. State agency adjudicators, like the state courts reviewing their decisions, can be expected to discharge

their "solemn obligation to follow federal law." *San Carlos Apache Tribe*, 463 U.S. at 571.

Moreover, to the extent the ranchers point to the clause in the 2019 Protocol that the parties would not "withhold any required concurrence" in a call made by the other party after following the consultation procedures, they overlook a key word. The Protocol states that "either Party may independently make a call and the other party will not withhold any required concurrence or object to the call," except that the United States reserves the right not to concur in a call that is inconsistent with the Administrative Determination or other legal obligations. Protocol at 4. Inclusion of the word "any" belies the ranchers' suggestion that the federal government had concluded such concurrence was "required."

In sum: There is no concurrence requirement imposed by federal law on the Tribes' reserved instream water rights, whether by the 1864 Klamath Treaty or the federal government's trust relationship. The McCarran Amendment subjects the Tribes' reserved water rights to state procedural rules in its quantification proceedings, but the substance and scope of the Tribes' rights remain governed by federal law. Oregon law does not require federal government concurrence to enforce the Tribes' water rights, and we leave for another day the question of what, if any, legal effect such a state requirement could have. Therefore, invalidating the Protocol, and requiring the federal government to independently assess whether it would concur in the Tribes' calls, would not remedy the ranchers' injuries. The Tribes would continue to make calls in the exercise of their Treaty rights, and OWRD would enforce the calls. Because the ranchers fail to show their alleged injuries are fairly traceable to federal government action or inaction, or would be redressed by striking the Protocol, they

lack Article III standing. Accordingly, the dismissal of the ranchers' complaint for lack of standing is affirmed.