# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 15, 2025         Decided May 22, 2026

No. 24-5193

NARRAGANSETT INDIAN TRIBE, ACTING BY AND THROUGH THE NARRAGANSETT INDIAN TRIBAL HISTORIC PRESERVATION OFFICE,
APPELLANT

v.

SEAN MCMASTER, ADMINISTRATOR, FEDERAL HIGHWAY ADMINISTRATION,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:22-cv-02299)

*Elizabeth T. Walker* argued the cause and filed the briefs for appellant.

*Kaitlyn E. Klass* was on the brief for *amicus curiae* United South and Eastern Tribes Sovereignty Protection Fund in support of appellant.

*Dimitar P. Georgiev*, Assistant U.S. Attorney, argued the cause for appellee. On the brief were *Jeanine Ferris Pirro*, U.S. Attorney, and *Jane M. Lyons* and *Bradley G. Silverman*, Assistant U.S. Attorneys. *Katherine C. Sadeck*, Assistant Attorney General, Office of the Attorney General for the State of Rhode Island, entered an appearance.

Before: MILLETT, WALKER and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: The State of Rhode Island has been reconstructing a bridge on Interstate 95 in Providence, Rhode Island for more than a decade. Because the Federal Highway Administration has provided federal funding for the construction, the State's project must comply with the National Historic Preservation Act ("Preservation Act"), 54 U.S.C. § 300101 *et seq.* The Preservation Act requires federal agencies funding a state project to "take into account the effect of the undertaking on any historic property." *Id.* § 306108.

Though it was not known at the time I-95 was first built in the 1950s, the construction disturbed an area that contains archaeological resources dating back at least 5,000 years and a site that has cultural and religious significance to the Narragansett Indian Tribe. That area is now known as the Providence Covelands Archaeological District ("Covelands"), a site that is eligible to be listed on the National Register of Historic Places. J.A. 149.

When Rhode Island sought federal funds to reconstruct aging parts of the I-95 bridge, the Federal Highway Administration determined that the project would have "adverse effects" on the Covelands, and so mitigation efforts had to be implemented.

This case involves a challenge to those mitigation measures. The Narragansett Tribe alleges that the Highway Administration's decision adopting certain mitigation strategies is (1) contrary to law both because the Tribe was not adequately consulted and because a tribal official was not included as a required signatory to the agreement implementing those strategies, and (2) arbitrary and capricious because the agency failed to explain changes it had made. The district court granted summary judgment for the Highway Administration, and the Tribe has appealed.

We affirm. While the Narragansett Tribe has standing, it does not succeed on the merits. The Preservation Act's implementing regulations do not require that a tribal officer sign a programmatic agreement when, as here, the affected land is not tribal land and the mitigation measures take place both off tribal land and off land that is controlled by or being transferred to a Tribe. In addition, the Highway Administration adequately consulted with the Tribe on the development of mitigation strategies, and it acknowledged and reasonably explained the changes it made to the final programmatic agreement.

**I**

**A**

Congress enacted the Historic Preservation Act in 1966 to protect historic sites that would otherwise be threatened by federally funded development projects. National Historic Preservation Act, Pub. L. No. 89-665, 80 Stat. 915, 915 (1966). Congress found that, "in the face of ever-increasing extensions of urban centers, highways, and residential, commercial, and industrial developments, [it is] necessary and appropriate for

the Federal Government to accelerate its historic preservation programs and activities[.]" *Id.*

This case principally concerns Section 106 of the Preservation Act, 54 U.S.C. § 306108. That Section requires federal agencies "having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State" to "take into account the effect of the undertaking on any historic property" before releasing any federal funds. *Id.*

Relatedly, the Preservation Act requires that, in complying with Section 106, the federal agency "shall consult with any Indian tribe * * * that attaches religious and cultural significance to property" that is "eligible for inclusion on the National Register [of Historic Places]." 54 U.S.C. § 302706(a), (b). To qualify under the statute as "historic," the affected properties do not have to be on tribal land, and "may include Tribal burial grounds, land vistas, and other sites that Tribal Nations regard as sacred or otherwise culturally significant" wherever located. *United Keetoowah Band of Cherokee Indians in Oklahoma v. FCC*, 933 F.3d 728, 733–734 (D.C. Cir. 2019) (formatting modified). Government-to-government consultation with affected tribes "is a background requirement of Section 106 review[.]" *Id.* at 745.

The Preservation Act tasks the Advisory Council on Historic Preservation with promulgating regulations that implement Section 106 review. 54 U.S.C. § 304108(a). These regulations provide two pathways for an agency to respond once it has determined that a federally funded project will have adverse historical impacts. The first option is the formal "section 106 process[,]" 36 C.F.R. § 800.3, in which a "memorandum of agreement" dictates certain terms of the project, aiming to reduce the impact on historic sites as much as possible, *see id.* § 800.6(b)–(c).

The second option applies when "circumstances warrant a departure from the normal section 106 process[,]" such as "[w]hen effects on historic properties cannot be fully determined prior to approval of an undertaking[.]" 36 C.F.R. § 800.14(b)(1)(ii), (v). In that case, the stakeholders can execute a "programmatic agreement" that provides for alternative mitigation strategies—known as "program alternatives"—to remedy any harm done to a historic site. *Id.* § 800.14(b)(2), (f).

As a federal agency is developing program alternatives, the agency must "ensure * * * appropriate government-to-government consultation with[,]" among others, "affected Indian tribes[.]" 36 C.F.R. § 800.14(f). Consultation is defined as "the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the section 106 process." *Id.* § 800.16(f). While consultation is a requirement, neither the Preservation Act nor its implementing regulations require that an agency "necessarily 'engage in any particular preservation activities.'" *United Keetoowah Band*, 933 F.3d at 734 (quoting *CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105, 107 (D.C. Cir. 2006)).

A programmatic agreement takes effect when signed by the Advisory Council, the agency official, and, "when the programmatic agreement concerns a specific region[,]" the relevant historic preservation officer(s). 36 C.F.R. § 800.14(b)(2)(iii).

**B**

In 2009, the State of Rhode Island began efforts to reconstruct portions of an I-95 bridge, known as the

"Providence Viaduct," which runs through Providence, Rhode Island. Because the project required federal funding, an initial Section 106 assessment was conducted over the next two years to determine whether the construction would impact historical land. *See United Keetoowah Band*, 933 F.3d at 745 ("Section 106 review comprises four steps: initiation, identification, assessment [or evaluation], and resolution.") (quotation marks omitted). In 2011, the Highway Administration determined that the reconstruction would have adverse effects on the Covelands, including on land that is religiously and culturally significant to the Narragansett Tribe. Because the Administration "in consultation with" the State of Rhode Island and the Narragansett Tribe determined that protection and recovery of the archaeological remains at the Covelands site were "not feasible due to environmental, logistical, and cost factors," the Highway Administration began to negotiate alternative mitigation measures. J.A. 177.

**1**

In October 2011, the Administration executed a programmatic agreement ("First Programmatic Agreement") with the Rhode Island State Historic Preservation Officer, the Rhode Island Department of Transportation, and the Narragansett Tribe's Historic Preservation Officer. J.A. 421–426. This Agreement provided for several mitigation measures, including that the State would transfer ownership of two parcels of land to the Narragansett Tribe—the Providence Boys Club-Camp Davis property and the Chief Sachem Night Hawk property. The agreement also provided for the State and the Tribe to share ownership of the Salt Pond Archaeological Preserve. The Agreement said nothing about the Narragansett Tribe waiving its sovereign immunity.

In January 2013, the Highway Administration permitted construction on the southbound section of the Providence Viaduct to proceed.

Eight months later, Rhode Island prepared deeds to officially transfer the properties identified in the First Programmatic Agreement to the Narragansett Tribe. The deeds included a "limited waiver of tribal sovereign immunity[,]" which stated that the Tribe must "waive [its] sovereign immunity as to the covenants contained in the deeds[.]" J.A. 125 (capitalization altered). As part of that waiver, the properties would "be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island." J.A. 122. The Tribe refused to waive its sovereign immunity, and the State, in turn, refused to transfer the properties without a waiver, which led to an impasse.

More than three years of unsuccessful negotiations between the State, the Tribe, and the Highway Administration ensued. An independent federal agency mediator was brought in and conducted four mediation sessions, none of which bore fruit. The Administration also hosted onsite meetings and published guidance for the State, but to no avail. The Advisory Council facilitated a meeting on Narragansett tribal land, but its efforts failed too.

On September 1, 2016, the Highway Administration sent a letter to Rhode Island stating that the Administration would not approve any further action related to the Providence Viaduct unless the State agreed to remove the requirement that the Tribe waive sovereign immunity. At that point, 90% of the southbound portion of the Providence Viaduct was complete, but construction on the northbound portion had not begun.

The State refused to budge. As a result of this stalemate, in January 2017, the Highway Administration terminated the original programmatic agreement and paused the northbound project.

**2**

In June 2018, the Highway Administration issued a letter to the Advisory Council and affected parties proposing new mitigation strategies. While the Tribe and Rhode Island would still share ownership over the Salt Pond Preserve, the State would not deed any other land to the Tribe. Instead, the State would provide "an academic-level historic context document[,]" "a video documentary[,]" and "a teaching curriculum for Rhode Island public schools" all about the Tribe. J.A. 186. The State would also conduct "Section 106 training" for tribal members. J.A. 186. The Narragansett Tribe was deeply dissatisfied with this proposal.

In November 2018, the Highway Administration sent the Narragansett Tribe a draft of a new programmatic agreement ("Second Programmatic Agreement"), which included the terms to which the Tribe had objected, and requested further comment. J.A. 283. The Administration also explained to the Tribe that there was a "broad public interest" in permitting the construction of the Providence Viaduct to go forward because of the heavy traffic on the I-95 corridor. J.A. 283.

The Narragansett Tribe objected both to the proposed agreement's "wholly inadequate" terms and to the drafting process, which involved "zero consultation or input from the Tribe." J.A. 325–326. The Tribe opposed, in particular, the education initiatives in lieu of land transfer as "insulting" and "completely unacceptable." J.A. 326.

Over the next few months, the Highway Administration hosted several telephone calls with the Narragansett Tribe. One was a Nation-to-Nation consultation—that is, a formal and individualized conversation between a federal official and a tribal official. The Administration also conducted two conference calls with affected parties. Through all of this, the Tribe continued to voice specific objections, including that the Tribe's Historic Preservation Officer had been demoted to a "Concurring Party" rather than a required "Signatory Party" to the Agreement. *See* J.A. 342–343. This change in status meant that the Tribal Officer's approval was no longer needed to execute the agreement. 36 C.F.R. § 800.6(c).

With no signs of a possible compromise and the bridge's deterioration posing a safety risk, the Highway Administration executed the Second Programmatic Agreement. The Agreement stated that Rhode Island would own the Salt Pond Preserve, the Providence Boys Club-Camp Davis, and the Chief Sachem Night Hawk properties. However, the State would be required to "sign and file preservation covenants for all three properties * * * that ensure that they will be protected in perpetuity from any development except for any alterations agreed upon by all signatories to this agreement." J.A. 398. Rhode Island would also ensure that the Narragansett Tribe's Historic Preservation Officer and tribal members would have "continued access to the properties for cultural use." J.A. 398–399.

The Second Programmatic Agreement made the Highway Administration, the Rhode Island State Historic Preservation Officer, and the Advisory Council required signatories, and it made the Tribe and the Rhode Island Department of Transportation "invited signator[ies.]" J.A. 402 (capitalization omitted). Narragansett's Tribal Historic Preservation Officer refused to sign. J.A. 402. Because a programmatic agreement

can be executed without invited signatories, *see* 36 C.F.R. § 800.6(c)(2)(iv), the agreement went into effect in September 2019, J.A. 402.

## C

This case is the third action pursued by the Narragansett Tribe involving the Providence Viaduct dispute.

In 2018, after a prior unsuccessful breach of contract suit against Rhode Island, Narragansett filed suit in the United Stated District Court for the District of Rhode Island against the Highway Administration's Acting Administrator, the Executive Counsel of the Rhode Island Governor, and the Rhode Island Department of Transportation. Because the action involved a federal official, the district court transferred the case to the United States District Court for the District of Columbia. 28 U.S.C. § 1404(a). The district court then dismissed the case against the State defendants without prejudice for lack of personal jurisdiction. *Narragansett Indian Tribe by & through Narragansett Indian Tribal Historic Pres. Off. v. Pollack*, No. 20-CV-576, 2022 WL 782410, at *5–6 (D.D.C. Mar. 15, 2022) ("*Narragansett I*"). The court also dismissed the case against the federal defendants without prejudice due to the Tribe's failure to sufficiently allege standing. *Id.* at *7–8.

Five months later, the Narragansett Tribe filed its third lawsuit against the same defendants. The court again dismissed the State defendants for lack of personal jurisdiction. *Narragansett Indian Tribe by & through Narragansett Indian Tribal Historic Pres. Off. v. Pollack*, No. 22-CV-2299, 2023 WL 4824733, at *5–7 (D.D.C. July 27, 2023) ("*Narragansett II*").

As for the Acting Administrator of the Federal Highway Administration ("Highway Administration"), the district court dismissed the Tribe's claims based on the First Programmatic Agreement for lack of standing because the court could not provide relevant redress since it was Rhode Island, not the Highway Administration, that refused to carry out the land transfers required by that Agreement. *Narragansett II*, 2023 WL 4824733, at *7–8. With respect to the Tribe's claims under the Second Programmatic Agreement, the district court held that the Tribe had standing. *Id*. at *9.

The district court subsequently granted summary judgment for the Highway Administration. *Narragansett Indian Tribe v. Bhatt*, No. 22-CV-2299, 2024 WL 3509491, at *1 (D.D.C. July 23, 2024) ("*Narragansett III*"). The court ruled that the Administration had engaged in adequate consultation under Section 106 and its implementing regulations, and that the Narragansett Tribe was not a required signatory to the Agreement. *See id.* at *5–15. Finally, the court rejected the Tribe's arbitrary and capricious claim, holding that the Administration had provided an adequate explanation for its differing treatment of the Tribe in the Second Programmatic Agreement as compared to the First. *Id.* at *12.

The Narragansett Tribe timely appealed.[1]

---

[1] The Narragansett Tribe did not appeal the district court's dismissal of its claim pertaining to the First Programmatic Agreement. So this appeal involves only the formation and execution of the Second Programmatic Agreement.

While the appeal was pending, Sean McMaster was confirmed as the Administrator of the Federal Highway Administration, and he has been substituted as Appellee. *See* FED. R. APP. P. 43(c)(2).

12

**II**

The district court exercised subject matter jurisdiction under 28 U.S.C. § 1331. This court's jurisdiction rests on 28 U.S.C. § 1291.

The Highway Administration contends that this court lacks jurisdiction because the Narragansett Tribe lacks Article III standing for two reasons. First, the Administration asserts that the Tribe's injury was neither caused by the agency nor redressable, given Rhode Island's intervening role in the First Programmatic Agreement's failure. Second, the Administration argues that the district court's first decision on standing collaterally estops the Tribe from establishing standing in this case.

The Highway Administration is incorrect on both fronts. Because the Tribe has pled a procedural injury that is traceable to the actions of the Highway Administration and redressable by court order and because the doctrine of collateral estoppel does not apply here, the Tribe has standing.

**A**

To demonstrate standing, a plaintiff must have suffered an injury in fact that is (1) "concrete, particularized, and actual or imminent"; (2) caused by the defendant; and (3) redressable by judicial relief. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).

**1**

The Narragansett Tribe has shown that, if the Highway Administration failed to adequately consult with the Tribe during the development of the Second Programmatic

Agreement, it will have suffered a procedural injury in fact. Had adequate consultation occurred, the Tribe explains, it could have obtained better protection over land that has deep cultural and historical significance for it.

A failure to comply with a statutory consultation requirement qualifies as an Article III injury. *Center for Biological Diversity v. Zeldin*, 171 F.4th 356, 374 (D.C. Cir. 2026) ("An agency's failure to meet its statutory consultation requirement is the 'archetypal procedural injury.'") (quoting *Center for Biological Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017)).

The Highway Administration does not dispute the existence of an Article III injury to the Narragansett Tribe. Instead, it argues that the Tribe failed to establish causation because it was Rhode Island that caused the first agreement to fall apart by depriving the Tribe of promised land transfers. The Highway Administration also argues that the Tribe's injury is not redressable because, even with further consultation, the Administration might not have adopted mitigation measures more amenable to the Tribe. *See* Admin. Br. 28–29.

To satisfy standing's causation prong, the Tribe must connect its lack-of-consultation injury to the Highway Administration's adoption of the Second Programmatic Agreement. *Hawkins v. Haaland*, 991 F.3d 216, 224 (D.C. Cir. 2021). Under the causation standard for procedural injuries, the Tribe does not have to show that "but for" the alleged procedural deficiency, the Highway Administration *would* have made a different and more favorable decision for the Tribe. *See id.* at 224–225; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992). All the Tribe has to show is that the procedural misstep "was connected to the substantive result" such that proper consultation *could* have led to a more

favorable outcome. *Hawkins*, 991 F.3d at 225 (quotation marks omitted). The Narragansett Tribe has met that standard by showing that proper consultation could have led to better protection for lands of historic and cultural concern to the Tribe. *See* Tribe Opening Br. 28–29; *Center for Biological Diversity v. EPA*, 56 F.4th 55, 68 (D.C. Cir. 2022).

The Highway Administration does not dispute that the Tribe has met the settled procedural-injury test for causation. Instead, it argues that normal, stricter standing rules apply because Rhode Island is a third party "obstacle" to the Tribe obtaining relief. *See* Admin. Br. 32 (quoting *St. John's United Church of Christ v. FAA*, 520 F.3d 460, 463 (D.C. Cir. 2008)). But the Tribe's challenges to the Second Programmatic Agreement (which are the only claims on appeal) are distinct from its dispute over Rhode Island's actions under the First Programmatic Agreement. The Tribe's present objection and injury focus not on Rhode Island's failure to deed the land under the first agreement, but on the Highway Administration's failure properly to hew to the Section 106 process and to meaningfully consult with the Tribe before executing the second agreement. In other words, the Tribe objects to the Administration denying it an appropriate seat at the table as the Second Programmatic Agreement was formulated, which in turn deprived the Tribe of a fair opportunity to gain culturally significant land or other benefits, such as funding for preservation efforts. *See* Tribe Opening Br. 26–30. Rhode Island's past failures have nothing to do with that.

Accordingly, the Narragansett Tribe has adequately shown both a connection between the alleged lack of adequate consultation and the Administration's decision to adopt the Second Programmatic Agreement's terms, as well as that agreement's adverse impact on the Tribe.

**2**

The Administration also argues that the Narragansett Tribe has failed to demonstrate redressability because it cannot show that it would ever have reached an agreement with Rhode Island on alternate land to be deeded to the Tribe given the sovereign-immunity Gordian knot. Admin. Br. 29.

That argument is wrong. The Narragansett Tribe has identified several ways the Highway Administration, were it ordered by a court to further consult with the Tribe, *could* adopt more favorable mitigation terms, which is all that is required for a procedural injury. *See Hawkins*, 991 F.3d at 225. For example, the Administration could "decide that alternative properties should be managed by the Tribe[.]" Tribe Opening Br. 30. Alternatively, the Tribe could be given "funding to develop its own mitigation measures[.]" *Id.*

The Highway Administration responds that the Tribe's "bare assertion that it can use Agency 'funds' to 'develop [its] own methods of mitigation' is conclusory[.]" Admin. Br. 33 (quoting Tribe Opening Br. 19) (formatting modified). Yet the record shows that the Administration and Rhode Island had previously discussed that very option. *See* J.A. 157 ("This letter is to confirm our conversation that it is allowable for [Rhode Island] to make a payment directly to the Narragansett Indian tribe to allow them to develop their own methods of mitigation for the impacts of the Providence Viaduct construction[.]").

Because the Narragansett Tribe has identified alternative mitigation proposals that are both possible and amenable to the Tribe, it has demonstrated redressability and, with that, has established Article III standing.

16

**B**

The Administration argues, in the alternative, that the doctrine of collateral estoppel, also known as issue preclusion, bound the district court—and now this court—to the earlier decision ruling that the Narragansett Tribe had not demonstrated standing in its first complaint and dismissing that complaint without prejudice. *See* Admin Br. 24 (citing *Narragansett I*, 2022 WL 782410, at *8). The Administration is incorrect.

Collateral estoppel means that "a prior judgment forecloses successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." *Herrera v. Wyoming*, 139 S. Ct. 1686, 1697 (2019) (formatting modified). "The idea is straightforward: Once a court has decided an issue, it is 'forever settled as between the parties[.]'" *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 147 (2015) (quoting *Baldwin v. Iowa State Traveling Men's Ass'n*, 283 U.S. 522, 525 (1931)). Said another way, "a losing litigant deserves no rematch after a defeat fairly suffered." *Id.* (quoting *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107 (1991)).

Collateral estoppel applies only if the issue was "actually decided" in a prior case. *Lucky Brand Dungarees, Inc. v. Marcel Fashions Group, Inc.*, 140 S. Ct. 1589, 1594 (2020). That did not happen here. The district court never ruled on whether the Tribe had standing to bring a procedural-injury claim related to the failure to consult. While the court pointed to a vague line in the Tribe's amended complaint about a right to consultation, the court stated that it is ultimately "not clear" whether the Tribe was asserting a "failure to consult" injury in its first complaint. *See Narragansett I*, 2022 WL 782410, at *7. After all, the court noted, "Narragansett did not provide

explanation" of such an injury "in its briefing[,]" nor did it dispute the Highway Administration's "characterization of the alleged injuries as being harm to the land itself and deprivation of the land." *Id.* The court ultimately determined that the Tribe had "laid out too few breadcrumbs" and "left too many questions unanswered" for the court to determine whether the Tribe was raising a procedural injury theory of standing, let alone to decide whether the Tribe would have standing under such a theory. *Id.* at *8; *see also id.* ("[T]he Court hesitates to speculate about how standing can be shown when Narragansett declined the opportunity to * * * more fully explain how it has standing."); *id.* ("Adopting any of the hypothetical arguments or interpretations discussed by the Court in this opinion regarding standing would have required an uncomfortable level of speculation."). Nor could the district court divine, based on the Tribe's pleading, whether such a procedural injury would relate to the First Programmatic Agreement or the Second. *See id.* at *7 n.7.

Because of all the uncertainties in this record, the district court expressly invited the Tribe to "try again" should it wish to assert a procedural injury like the failure-to-consult claim now pressed by the Tribe. *Narragansett I*, 2022 WL 782410, at *8. That discussion by the district court bears little resemblance to the full and conclusive determination of a legal issue to which collateral estoppel would apply.

The Highway Administration argues that the Tribe can establish standing "only if a material change following dismissal cured the original jurisdictional deficiency." Admin. Br. 23 (quoting *National Ass'n of Home Builders v. E.P.A.*, 786 F.3d 34, 41 (D.C. Cir. 2015)). That argument, which invokes the "curable defect" doctrine, puts the cart before the horse. The "curable defect" doctrine provides an exception to "the preclusive effect of issues already fairly and finally determined

in prior litigation" when subsequent events render standing proper. *National Ass'n of Home Builders*, 786 F.3d at 41–42; *Scahill v. District of Columbia*, 909 F.3d 1177, 1182 (D.C. Cir. 2018). Because there was no prior final and conclusive determination of the Tribe's standing to procedurally challenge the formation of the Second Programmatic Agreement, there is no issue preclusion for which the Tribe needs an exception.[2]

For all those reasons, the Tribe has standing in this case.

**III**

Turning to the merits, the Narragansett Tribe argues that the Highway Administration acted both contrary to law and arbitrarily and capriciously when it failed to make the Tribe a required signatory to the Second Programmatic Agreement and did not meaningfully consult with the Tribe during the formation of the Agreement. None of these arguments succeed.

**A**

**1**

The Narragansett Tribe first contends that the Administration acted contrary to the Section 106 regulations

---

[2] The Highway Administration did not raise the affirmative defense of collateral estoppel before the district court either in its motion for summary judgment or its opposition to the Tribe's cross-motion for summary judgment. Nevertheless, the Administration argues that it properly preserved this argument on appeal because it asserted "[c]laim and/or issue preclusion" as an enumerated defense in its Answer. Admin Br. 27 (citing J.A. 38). The Tribe does not argue otherwise. We accordingly assume without deciding that the Administration preserved this issue.

when it failed to make the Tribe a required signatory to the Second Programmatic Agreement.  That argument fails.

The regulations promulgated by the Advisory Council enumerate three kinds of signatories to programmatic agreements or memoranda of understanding.  *See* 36 C.F.R. § 800.6(c).  First, "[s]ignatories"—what we will call "required signatories" for clarity—are parties that "have sole authority to execute" an agreement.  36 C.F.R. § 800.6(c)(1).  Without each required signatory, an agreement cannot go into effect.

The second tier is "[i]nvited signatories[,]" who are "additional parties" that the agency official "may invite" to join the agreement.  36 C.F.R. § 800.6(c)(2)(i).  For example, an "agency official *may* invite an Indian tribe * * * that attaches religious and cultural significance to historic properties located off tribal lands" to be an invited signatory, and the agency official also "*should* invite any party that assumes a responsibility" under the agreement.  *Id.* § 800.6(c)(2)(ii), (iii) (emphases added).  Invited signatories are not necessary for the execution of an agreement, but they can "seek[] amendment or termination" once the agreement is in place.  *Id.* § 800.6(c)(2)(i), (iv).

Finally, an agency "may invite all consulting parties to concur" in an agreement.  36 C.F.R. § 800.6(c)(3).  The signature of concurring parties is not necessary to execute an agreement, and they do not enjoy the termination and amendment powers accorded to invited signatories.  *Compare id.* § 800.6(c)(3), *with id.* § 800.6(c)(2)(i).[3]

---

[3]  While 36 C.F.R. § 800.6 governs the formal Section 106 process, an agency may "substitute" a programmatic agreement "for

Both the Tribe's Historic Preservation Officer and the Rhode Island Department of Transportation were "invited signatories" to the Second Programmatic Agreement. J.A. 402 (capitalization altered); *see* 36 C.F.R. § 800.6(c)(1). As an "invited" signatory, the Tribe's signature—and by extension its approval—were not required, and so it could not block the agreement's adoption. *Compare* 36 C.F.R. § 800.6(c)(1), *with id.* § 800.6(c)(2)(iv).

Because neither the reconstruction of the Providence Viaduct nor any of the mitigation strategies included in the Second Programmatic Agreement affected tribal lands or their acquisition, nothing in the regulations or agency guidance obligated the Highway Administration to include the Tribe as a required signatory.

The governing regulation states, in relevant part:

> The programmatic agreement shall take effect when executed by the Council, the agency official and the appropriate SHPOs/THPOs [State Historic Preservation Officers/Tribal Historic Preservation Officers] when the programmatic agreement concerns a specific region * * *. A programmatic agreement shall take effect on tribal lands only when the THPO, Indian tribe, or a designated representative of the tribe is a signatory to the agreement. * * * If a THPO assumes the responsibilities of a SHPO pursuant to

all or part" of the formal process, 36 C.F.R. § 800.14(a). Here, the Highway Administration has engaged in just such a mix-and-match of the two processes. For example, the Administration's inclusion of "invited signatories" in the final Second Programmatic Agreement, J.A. 402, derives from the formal Section 106 process, 36 C.F.R. § 800.6(c)(2). So the regulations cast helpful light on the signature issue pressed by the Tribe.

> section 101(d)(2) of the act and the SHPO is signatory
> to [the] programmatic agreement, the THPO assumes
> the role of a signatory, including the right to terminate
> a regional programmatic agreement on lands under
> the jurisdiction of the tribe.

36 C.F.R. § 800.14(b)(2)(iii).

The crux of the disagreement between the Narragansett Tribe and the Administration is over the meaning of the virgule—the forward slash (/)—between "SHPO" (State Historic Preservation Officer) and "THPO" (Tribal Historic Preservation Officer) in the opening sentence of the regulation. The Tribe argues that the virgule means "and" so that both state and tribal officers are always required signatories. The Administration counters that the virgule means that one officer "or" the other is required, not necessarily both, and that the other sentences in this subsection support that reading.

The Tribe is mistaken in reading the virgule in this context to always mean "and."

A virgule is a rare bird in statutory and regulatory language, perhaps due to "the sloppy ambiguity" it can cause. *Quezada-Daza v. United States*, 107 F. App'x 808, 809 (9th Cir. 2004). Most commonly, the virgule "is used to separate alternatives," not as a conjunction. *Knous v. United States*, 683 F. App'x 859, 864 (11th Cir. 2017); *see also id.* at 863–864 (rejecting reading of a virgule to mean "and"); *Dynalectron Corp. v. Equitable Tr. Co.*, 704 F.2d 737, 739 (4th Cir. 1983) (reading a virgule as separating alternatives and rejecting an argument that it meant "and"); *Heritage Bank v. Redcom Labs., Inc.*, 250 F.3d 319, 326 & n.6 (5th Cir. 2001) (same); *United States v. Owens*, 904 F.2d 411, 414 (8th Cir. 1990) (same).

What precisely the virgule means often depends on context. And when, as here, neither the undertaking nor the programmatic agreement affects tribal land, nor did the agreement involve tribal acquisition of or control over land, the regulation's plain meaning requires only the signature of the State Historic Preservation Officer, and not the Tribal Officer.

Dictionaries around the time of the promulgation of these regulations corroborate that the virgule usually signifies alternatives, unless the context dictates otherwise. *See* RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 2125 (def. 1) (2d ed. 1998) (defining "virgule" as "a short oblique stroke (/) between two words indicating that whichever is appropriate may be chosen to complete the sense of the text in which they occur"); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, 1995 (def. 1) (3rd ed. 1996) (defining "virgule" as "[a] diagonal mark ( / ) used especially to separate alternatives, as in *and/or*").

Regulatory context confirms that, in this situation, the virgule does not mean "and." The first sentence of the subsection states that a programmatic agreement will take effect when signed by "the appropriate SHPOs/THPOs *when the programmatic agreement concerns a specific region*[.]" 36 C.F.R. § 800.14(b)(2)(iii) (emphasis added). So the requirement for execution by either the State or Tribal Officer is qualified: Which signatures are required depends on what "specific region" is affected by the project or mitigation measures. *Id.* That is, a State Officer's signature will be required when the undertaking or mitigation program involve matters within the geographic control of that State. The same is true for a Tribal Officer when the affected historic properties or mitigation measures are located on existing or to-be-acquired tribal lands or on land otherwise under the Tribe's governmental control. Only when the agreement affects both

state and tribal lands will the virgule conjunctively require both officers' signatures.

The next sentence of the regulation follows from that same understanding: "A programmatic agreement shall take effect on tribal lands only when the THPO, Indian tribe, or a designated representative of the tribe is a [required] signatory to the agreement." 36 C.F.R. § 800.14(b)(2)(iii). If the first sentence of the subsection required a Tribal Officer in all circumstances, there would be no reason for the Advisory Council to have included a separate sentence identifying the more specific circumstances when a tribal representative's signature is required. Courts generally read regulations, like statutes, to avoid superfluity. *See National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 668 (2007).

The last sentence brings the point home: "If a THPO assumes the responsibilities of a SHPO pursuant to section 101(d)(2) of the [A]ct and the SHPO is signatory to [the] programmatic agreement, the THPO *assumes the role of a signatory*, including the right to terminate a regional programmatic agreement on lands under the jurisdiction of the tribe." 36 C.F.R. § 800.14(b)(2)(iii) (emphasis added). There would be no reason for the Tribal Officer ever to "assume[] the role of a signatory" if that person were always a required signatory. *Id.*

The sentence's reference to Section 101(d)(2) of the Preservation Act makes the same point: "An Indian tribe *may assume* all or any part of the functions of a State Historic Preservation Officer * * *, *with respect to tribal land*, as those responsibilities may be modified for tribal programs through regulations issued by the Secretary[.]" 54 U.S.C. § 302702 (emphases added). This statutory focus on tribal land underscores that the Tribal Historic Preservation Officer's

signature is required only when the undertaking or programmatic agreement involves tribal lands, or the agreement deeds lands to the Tribe or renders them under the Tribe's control.

Parallel regulations governing the formal Section 106 process, which regulate memoranda of agreement rather than programmatic agreements, likewise indicate that a tribal representative is at most an invited signatory if tribal lands are not implicated. The regulation is explicit that "[t]he agency official *may*"—not must—"invite an Indian tribe * * * that attaches religious and cultural significance to historic properties located off tribal lands to be a signatory to a memorandum of agreement concerning such properties." 36 C.F.R. § 800.6(c)(2)(ii) (emphasis added). In contrast, the agency "*should* invite any party that assumes a responsibility under a memorandum of agreement to be a signatory." *Id.* § 800.6(c)(2)(iii) (emphasis added).

Lastly, agency guidance from the Advisory Council—the agency that promulgated the Section 106 regulations—also reads the virgule as identifying alternative signatories when "the undertaking or affected historic properties are not on tribal lands." J.A. 98. The Advisory Council's Handbook on Consultation with Indian Tribes in the Section 106 Review Process directly answers the question: "Is the federal agency obligated to invite an Indian tribe to be a signatory or a concurring party to an MOA [Memorandum of Agreement] or PA [Program Alternative]" that is off tribal lands? J.A. 98.

> No, the agency may, but is not required to, invite an Indian tribe to become a signatory or concurring party when the undertaking or affected historic properties are not on tribal lands. * * * Certainly, agencies are encouraged to invite Indian tribes that attach religious

and cultural significance to affected historic properties to sign the agreement. If a tribe is assuming review or other responsibilities under the MOA or PA, the agency should consider inviting the tribe to become a signatory.

J.A. 98.

In short, the plain text of the implementing regulation, the surrounding context, and agency guidance establish that the Tribe was not a required signatory to the Second Programmatic Agreement because the effects of the Providence Viaduct, namely, the impact on the Covelands, occur off tribal land, and the historic sites addressed in the programmatic agreement are not and will not become tribal land or be controlled by the Tribe.

**2**

The Tribe next argues that the Highway Administration acted contrary to law in failing to consult in good faith with the Tribe in developing the Second Programmatic Agreement. The record forecloses that contention.

The Preservation Act mandates that "a Federal agency shall consult with any Indian tribe * * * that attaches religious and cultural significance" to historic property threatened by a federal "undertaking[.]" 54 U.S.C. §§ 302706(b), 306108. Both sides agree that the consultation requirement applied to the Highway Administration's formulation of the Second Programmatic Agreement. They disagree, however, on what that requirement entails.

While the Preservation Act imposes a duty to consult, it does not elaborate on the contours of that duty. Regulations

promulgated by the Advisory Council, though, provide helpful guidance on what, in the Council's view, constitutes adequate consultation, *see* 36 C.F.R. pt. 800. One regulation states, as relevant here, that an agency must "ensure that consultation in the section 106 process provides the Indian tribe * * * a reasonable opportunity to":

- "identify its concerns about historic properties,"
- "advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance,"
- "articulate its views on the undertaking's effects on such properties,"
- "and participate in the resolution of adverse effects."

36 C.F.R. § 800.2(c)(2)(ii)(A).

In addition, in proposing a program alternative, an agency must "ensure that development" of that mitigation strategy includes "appropriate government-to-government consultation with affected Indian tribes[.]" 36 C.F.R. § 800.14(f). In those consultations, the agency and Advisory Council must take the Tribe's views "into account in reaching a final decision on the proposed program alternative." *Id.* § 800.14(f)(2).

Finally, "consultation" is defined as "the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them[.]" 36 C.F.R. § 800.16(f).

Said more simply, meaningful consultation occurs when the affected tribes are afforded an opportunity to share their concerns about a project, participate in the formulation of a program alternative, and raise concerns regarding a mitigation proposal. *See United Keetoowah Band*, 933 F.3d at 750–751.

Importantly, Section 106 promises consultation and consideration, not particular results. As long as agencies "'seek[], discuss[], and consider[] the views of' the Tribes, even if [they] d[o] not ultimately adopt those views[,]" the Section 106 consultation requirement is satisfied. *Id.* at 751 (quoting 36 C.F.R. § 800.16(f)).

The Highway Administration met that consultation obligation here.

To start, the Highway Administration provided the Narragansett Tribe with a reasonable opportunity to participate in the crafting of the Second Programmatic Agreement. Between October 2018 and July 2019, the Administration sent five letters to the Tribe explicitly requesting its comments on various drafts of the Second Programmatic Agreement and related documents. *See* J.A. 188 (letter asking for comments on proposed changes from First Programmatic Agreement); J.A. 283–290 (letter asking for comments on first draft of Second Programmatic Agreement); J.A. 328 & 329 (letters seeking comments on draft deed for the Salt Pond Preserve); J.A. 362 (letter seeking comments on second draft of the Second Programmatic Agreement).

The Administration also invited the Narragansett Tribe to participate in three telephonic conferences to discuss the Second Programmatic Agreement's development. *See* J.A. 281, 313 (conference call with all signatories and Tribe), J.A. 379 (Nation-to-Nation call between Administration and Tribe), J.A. 371 (call with signatories to which Tribe was invited).

The Narragansett Tribe does not dispute the frequency or timeliness of the Administration's communications and outreach. Its argument, instead, is that the agency had already made up its mind on the content of the Second Programmatic

Agreement before obtaining the Tribe's views on the new mitigation strategies.

The record shows otherwise. The Highway Administration made significant changes to the Second Programmatic Agreement's content that responded to the Tribe's views and objections.

*First*, the Highway Administration originally circulated a draft programmatic agreement that proposed, among other things, that Rhode Island develop (1) "a professional publication * * * that compiles and summarizes the available ethnographic, archaeological, scientific and other literature, accounts, and studies regarding the history of the Narragansett Tribe in Rhode Island[,]" (2) "a full-length documentary film about the Narragansett Indian Tribe in Rhode Island[,]" and (3) "an educational curriculum * * * regarding the history of the Narragansett Tribe in Rhode Island." J.A. 285–287. After the Tribe called those measures "insulting," J.A. 326, the Highway Administration removed them, J.A. 396–402.

*Second*, the initial draft of the Second Programmatic Agreement did not even mention the "Providence Boys Club-Camp Davis" and the "Chief Sachem Night Hawk" properties, *see* J.A. 284–290, that the Tribe had hoped to acquire under the First Programmatic Agreement. After consultation with the Tribe, the final version of the Second Programmatic Agreement included "preservation covenants for all three properties * * * that ensure that they will be protected in perpetuity from any development except for any alterations agreed upon by all signatories to this agreement," which the Highway Administration had expected would include the Tribe. J.A. 398. The covenants also mandate that the Tribe's Tribal Historic Preservation Officer and Tribal members be afforded "continued access to the properties for cultural use."

J.A. 398–399. While these changes do not afford the Tribe the full control offered by the First Programmatic Agreement, the inclusion of these covenants responded to the Tribe's frequently stated concerns about Rhode Island retaining full control over these lands given their historical and cultural significance to the Tribe. *See, e.g.*, J.A. 364; J.A. 367.

*Third*, the Highway Administration upgraded the Tribe's signatory status. The first draft of the Second Programmatic Agreement listed the Tribe's Historic Preservation Officer as only a "concurring part[y,]" J.A. 290 (capitalization altered). After the Tribe objected, the Highway Administration elevated the tribal officer's status to an "invited signatory," J.A. 402 (capitalization altered).

While the Tribe focuses on its desire to receive the land transfers for which the First Programmatic Agreement had provided, Section 106 "is a 'stop, look, and listen' provision[.]" *Illinois Com. Comm'n v. Interstate Com. Comm'n*, 848 F.2d 1246, 1260–1261 (D.C. Cir. 1988). The Act does not require any specific outcomes. *Davis v. Latschar*, 202 F.3d 359, 370 (D.C. Cir. 2000).

Having provided the Narragansett Tribe with multiple opportunities to provide input and having incorporated the Tribe's feedback to the extent feasible in a multi-party agreement, the Highway Administration adequately discharged its statutory obligation to consult. [4]

---

[4] The Narragansett Tribe contends that the district court erred by impermissibly giving *Chevron* deference to the Highway Administration's interpretation of the Section 106 process given *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024). But the district court did not defer to the agency's legal conclusions and instead conducted its own *de novo* analysis, as *Loper Bright* directs.

## B

In addition to the Narragansett Tribe's contrary to law arguments, the Tribe contends that the Highway Administration's change in position from the First Programmatic Agreement to the Second Programmatic Agreement was an arbitrary and capricious change of policy without adequate explanation. The Tribe challenges both the substantive changes between the two Agreements and the change in the Tribe's signatory status.

Neither argument succeeds. Agencies may change their policies if they (1) "display awareness that they are changing position," (2) "provide a reasoned explanation for the change," and (3) "consider serious reliance interests." *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 918 (2025) (formatting modified). The Highway Administration has done all three here.

## 1

The Highway Administration adequately acknowledged and reasonably explained the substantive changes between the First and Second Programmatic Agreements, and it addressed the Tribe's reliance interests.

On January 19, 2017, the Highway Administration wrote to all affected parties, including the Narragansett Tribe, advising that it was terminating the First Programmatic Agreement. J.A. 170. The letter cited to the intractable disagreement between Rhode Island and the Tribe over the State's refusal to deed land

---

*See Narragansett III*, 2024 WL 3509491, at *8–15. We have done the same.

without a waiver of sovereign immunity. J.A. 170. The Administration stated that, despite years of effort, it "has not been able to resolve the impasse." J.A. 171.

Seventeen months later, the Highway Administration informed the same parties that it was "reinitiat[ing] the Section 106 consultation for the [Providence Viaduct] project and draft[ing] a new" programmatic agreement in response to the comments of the Advisory Council "and all Section 106 consulting parties," including the Tribe. J.A. 186–187.

The letter then enumerated proposed changes to the mitigation measures. J.A. 186. The agency laid out what would stay the same from the First Programmatic Agreement (joint ownership of the Salt Pond Preserve) and what would change (no transfer of the other two properties). *Id.* The Administration's acknowledgment of the changes between the two agreements could hardly have been more explicit.

The Highway Administration also reasonably explained why it was making the changes. Because Rhode Island refused to relent on its demand for a waiver of tribal sovereign immunity, the initial plan for deeding the Providence Boys Club-Camp Davis and Chief Sachem Night Hawk properties to the Tribe could not go forward. At the same time, the imperative concerns for public safety and the pressing transportation needs in a heavily trafficked area required the Highway Administration to forge a new programmatic agreement for the construction project. *See* J.A. 283.

No serious reliance interests were impacted by this change, because the Tribe never owned any of the property enumerated in the First Programmatic Agreement since the land transfers never occurred. J.A. 170–171.

Finally, on July 11, 2019, the Highway Administration notified the Tribe and other affected parties of the mitigation terms adopted in the Second Programmatic Agreement after consultation with the Tribe. J.A. 389. The agency explained that the agreement would "preserve[]" the properties originally meant to be deeded to the Tribe, and that "[t]he proposed transfer of the Salt Pond Archaeological Preserve property to [Rhode Island]," rather than to the Tribe, "is the result of the Tribe not accepting the conditions stipulated in the Draft Bargain and Sales Deed transmitted to the Tribe on December 19, 2018 for review and comments[,]" a conclusion the record supports. J.A. 389.

In short, the Highway Administration's execution of the new agreement was "permissible under the statute," and the agency reasonably explained its "conscious change[.]" *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Nothing more was required.

**2**

The Tribe also labels arbitrary and capricious the Administration's change in required signatories. The First Programmatic Agreement included four required signatories: the Highway Administration, the State Historic Preservation Officer, the Tribe's Historic Preservation Officer, and the Rhode Island Department of Transportation. J.A. 426. When the Administration circulated a draft of the Second Programmatic Agreement to the Tribe in November 2018, the draft listed the Tribe as a concurring party rather than a signatory. J.A. 290. But the final version of the Second Programmatic Agreement elevated the status of the Tribe to an "invited signatory[,]" while keeping the Advisory Council as a required signatory and including the Rhode Island Department

of Transportation as an invited signatory like the Tribe. J.A. 402 (capitalization altered).

The Highway Administration acknowledged and adequately explained its initial change in the Tribe's signatory status from a required party under the First Programmatic Agreement to a concurring party in the Second Programmatic Agreement. The agency reasoned that the Tribe was no longer a required signatory because "the mitigation commitments in the [draft programmatic agreement] do not require any action or responsibility on the Tribe." J.A. 346 (citing 36 C.F.R. § 800.6(c)(3)). More specifically, unlike under the First Programmatic Agreement, no land was being deeded to the Tribe under the Second Programmatic Agreement, so it was no longer a required signatory, *see* Section III.A.1., *supra*, and the Tribe had no duties to perform, so it no longer had to be treated as an "[i]nvited signator[y,]" 36 C.F.R. § 800.6(c)(2)(iii). Accordingly, the Highway Administration both acknowledged the change and reasonably explained it.

It is not clear from the Tribe's briefing if it also objects to the elevation in its status from a concurring party to an invited signatory. That argument would fail regardless. The Highway Administration elevated the Tribe from concurring party to invited signatory after extensive consultation with the Tribe, *see* Section III.A.2., *supra*, and after the Tribe specifically objected to its status as a mere concurring party, *see* J.A. 313, 326. No further explanation was necessary.

## IV

For the foregoing reasons, we affirm the district court's grant of summary judgment to the Highway Administration and its denial of the Narragansett Tribe's cross-motion for summary judgment.